## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ———————————————————— ) | |
| ENEZ KOLENOVIC,                                      ) | |
|                                                              ) | |
|           Petitioner,                              ) | **Civil Action No.** |
|                                                              ) | **19-10068-FDS** |
|           v.                                             ) | |
|                                                              ) | |
| NELSON ALVES,                                      ) | |
|                                                              ) | |
|           Respondent.                             ) | |
| ———————————————————— ) | |

## MEMORANDUM AND ORDER ON
## <u>PETITION FOR WRIT OF HABEAS CORPUS</u>

**SAYLOR, C.J.**

This is a petition for a writ of habeas corpus by a prisoner in state custody. Petitioner Enez Kolenovic is an inmate at Massachusetts Correctional Institution – Norfolk. Respondent Nelson Alves is the current superintendent of that facility.[1]

Kolenovic was convicted of first-degree murder on February 1, 1999, in the killing of David Walker. While his direct appeal was pending, Kolenovic filed a motion for a new trial alleging ineffective assistance of counsel. After several evidentiary hearings, the trial judge ultimately granted the new trial motion on November 12, 2013. The Commonwealth of Massachusetts appealed. On June 23, 2015, the Massachusetts Supreme Judicial Court reversed the trial judge's order granting a new trial. On October 18, 2017, the SJC rejected Kolenovic's arguments on direct appeal and affirmed the conviction.

In January 2019, Kolenovic filed this petition for a writ of habeas corpus under 28 U.S.C.

---

[1] The Court has substituted the name of the current officer pursuant to Fed. R. Civ. P. 25(d).

§ 2254, alleging that the SJC's ruling on his claim for ineffective assistance of counsel involved

an unreasonable application of clearly established federal law.  That claim is based on trial

counsel's decision to forego further investigation of post-traumatic stress disorder as a defense to

criminal responsibility.  For the reasons set forth below, the petition will be denied.

I.     **Background**

The following facts are taken primarily from the opinions of the SJC in *Commonwealth v.*

*Kolenovic*, 471 Mass. 664 (2015) ("*Kolenovic I*") and *Commonwealth v. Kolenovic*, 478 Mass.

189 (2017) ("*Kolenovic II*").

A.     **Events of September 15-16, 1996**

At approximately 12:45 p.m. on September 15, 1996, Enez Kolenovic started drinking

with a friend, David Bruso, at a bar owned by Jack McCrystal.  *Kolenovic I*, 471 Mass. at 665.

The bar was in a building owned by McCrystal that also housed a restaurant run by Kolenovic's

family.  *Id.* at n.3.  As the afternoon continued, Kolenovic and Bruso stopped at Bruso's liquor

store, where they obtained eight to ten single-shot bottles of 100-proof alcohol.  *Id.* at 665.  They

then drank those bottles at a barbecue at the local hall of the Knights of Columbus.  *Id.*  While at

the barbecue, Kolenovic consumed an additional six beers and four shots of 70-proof alcohol.

*Id.*  He also met a woman he knew, Missy Radigan, and the two of them briefly went to

McCrystal's bar for a drink before returning to the barbecue.  *Id.* at 666.  Back at the barbecue,

they fell when attempting to dance together.  *Id.*

They again returned to McCrystal's bar at about 9:30 p.m.  *Id.*  Later in the evening,

Kolenovic called McCrystal to drive him and Radigan home.  *Id.*  When McCrystal arrived, he

saw Kolenovic and Radigan in the restaurant and went to the bar to wait for them.  *Id.*  They then

joined him at the bar; Kolenovic ordered a cognac, and Radigan and McCrystal each ordered a

beer.  *Id.*  The bartender was at first reluctant to serve Kolenovic and Radigan as they appeared

2

to be intoxicated, but McCrystal said he would be driving them home.  *Id.*

At approximately 11:00 p.m., Kolenovic had an altercation with the victim, David Walker, who was also a patron at the bar.  *Id.*  Kolenovic had thrown a drink on Radigan, to which Walker responded, "You don't treat a lady like that."  *Id.*  Kolenovic warned Walker, "Don't cross my path," and challenged him to take the dispute outside.  *Id.*  There, both men continued arguing, frequently bumping chests, until a police officer from a station across the street arrived.  *Id.*  Kolenovic and Walker assured the officer that there was no problem between them, they returned to the bar, and Kolenovic bought Walker a drink.  *Id.*

After spending several hours sleeping in his car following the barbecue, Bruso returned to McCrystal's bar.  *Id.*  There he saw Kolenovic with "very glossy [sic] eyes."  *Id.*  He had never seen Kolenovic so drunk, describing him as "very intoxicated to the point of almost being asleep."  *Id.*  Irene Grigas, another patron at the bar, also noted that she had never seen Kolenovic that intoxicated.  *Id* at 666-67.

At 12:30 a.m. on September 16, when the bartender started to close the bar, Kolenovic, Radigan, and McCrystal made plans to continue the party at Kolenovic's apartment.  *Id.* at 667. Before leaving, Kolenovic went to the restaurant area for about five minutes and put on a winter jacket he kept there.  *Id.*  The weather that evening was described as an "Indian Summer September type of night."  *Id.*

When Kolenovic came outside, he was told Walker would not be joining them.  *Id.*  He then returned to the bar and exited a few minutes later followed by Walker.  *Id.*  He requested that Radigan sit in the backseat, directed Walker to the front passenger seat, and then sat in the backseat behind Walker.  *Id.*  Radigan complied.  *Id.*  McCrystal was in the driver's seat of the vehicle.  *Id.*

On the drive to Kolenovic's apartment complex, McCrystal stopped for a few minutes to talk to a police officer in a cruiser.  *Id.*  Then, about 100 yards from the complex, Kolenovic leaned forward and put his arm around Walker.  *Id.*  McCrystal admonished them for "fooling around," and Radigan saw Kolenovic lean forward.  *Id.*  Both Radigan and McCrystal felt and saw blood, and McCrystal stopped the car.  *Id.*  Kolenovic pulled Walker from the vehicle, stabbing him.  *Id.*  McCrystal shouted for Kolenovic to "get off him, you're going to kill him." *Id.*  Kolenovic replied, "I think it's too late for that."  *Id.*  McCrystal pushed Kolenovic off Walker and then noticed that Kolenovic had a knife, which he recognized as the type used at Kolenovic's family's restaurant.  *Id.*  Kolenovic told McCrystal, "You've got to be with me on this."  *Id.*  McCrystal responded, "What, are you crazy? . . . No way."  *Id.* (omission in original).

Kolenovic ran to McCrystal's vehicle and got into the driver's seat.  *Id.*  McCrystal unsuccessfully tried to shut off the engine by reaching through the window.  *Id.* at 667-68.  At this point, police officer Scott J. Crevier arrived in response to a telephone call from a resident. *Id.* at 668.  Crevier unsuccessfully tried to block Kolenovic's exit from the parking lot.  *Id.* Kolenovic and the police then engaged in a high-speed car chase, approaching 110 miles per hour at times.  *Id.*  Eventually the police apprehended Kolenovic, spraying him with mace when he resisted.  *Id.*

 At 2:55 a.m., Kolenovic, accompanied by police, was treated at the hospital for the effects of mace.  *Id.*  He smelled of alcohol and admitted to having drunk a lot.  *Id.*  However, the emergency-room physician did not evaluate his alcohol level because Kolenovic's "gait was normal, his speech was clear, his coordination was intact," and "he was cooperative."  *Id.*  At the police station later, an officer observed that Kolenovic's eyes were "bloodshot, glassy, and watery," his speech was "very slow," and it "took a while" for him to answer questions.  *Id.*

Approximately four hours after the murder, two breathalyzer tests were administered to Kolenovic, registering his blood alcohol level as 0.17 and 0.16 percent. *Id.* at 669 n.4.

Walker was pronounced dead at 1:28 a.m. *Id.* at 668. The medical examiner concluded that the "major fatal wound" was one inch deep and six-and-one-half inches long, running from the middle of Walker's neck to behind his ear. *Id.* Walker had a total of nine knife wounds to his neck, head, chest, abdomen, shoulder, and back. *Id.*

### B. The Indictment and Trial

In September 1996, a grand jury indicted Kolenovic for murder. *Kolenovic II*, 478 Mass. at 192. An eleven-day jury trial was held in February 1999. *Id.*; *Kolenovic I*, 471 Mass. at 664. The prosecution proceeded on two theories of first-degree murder: deliberate premeditation and extreme atrocity or cruelty. *Kolenovic II*, 478 Mass. at 192.

At trial, Kolenovic raised an intoxication defense. *Kolenovic I*, 471 Mass at 668. The defense argued that due to his long history of alcoholism and excessive consumption of alcohol before the killing, Kolenovic was incapable of forming the specific intent required for both theories of murder. *Id.* David Bruso and Irene Grigas testified in support of this theory, as did an expert witness, Dr. Robert A. Fox, Jr. *Id.* Bruso and Grigas testified about the drinking on the day before the incident and about Kolenovic's demeanor. *Id.* Dr. Fox, a psychiatrist with expertise in substance abuse, testified to the effects of Kolenovic's intoxication on his thinking and reasoning functions. *Id.* From the breathalyzer test results, Dr. Fox extrapolated that Kolenovic's blood alcohol content at the time of the murder was likely between 0.26 and 0.3 percent. *Id.* at 668-69 & n.4. He also explained the physiological effects of alcohol on the body's ability to think, reason, remember, make connections, and concentrate, as well as its effect of lowering inhibitions. *Id.* at 669. Dr. Fox opined that Kolenovic's higher functions—specifically, his ability to premeditate, form intent, and process what he was doing—would have

been impaired that night.  *Id.* at 668.

On February 2, 1999, the jury convicted Kolenovic of murder in the first degree by extreme atrocity or cruelty and acquitted him of murder in the first degree by deliberate premeditation.  *Id.* at 664 & n.1.  On the same day, the trial court imposed the mandatory sentence of life imprisonment without parole.  (Pet'r's Mem. at 3, ECF No. 2; Resp't's Mem. in Opp'n at 5, ECF No. 18).

### C.    Motion for New Trial

On March 21, 2003, while his direct appeal to the Massachusetts SJC was pending, Kolenovic, represented by new counsel, filed two motions:  (1) a motion for a new trial claiming ineffective assistance of counsel and error in the jury instructions and (2) a motion for reduction of the verdict pursuant to Mass. R. Crim. P. 25(b)(2), based on intoxication at the time of the killing.  *Kolenovic I*, 471 Mass. at 665 & n.2, 669 n.5; *Kolenovic II*, 478 Mass. at 192.  The SJC stayed the direct appeal and remanded the motions to the Superior Court.  *Kolenovic I*, 471 Mass. at 665; *Kolenovic II*, 478 Mass. at 192.[2]  The trial court denied both the motion for reduction of the verdict and the motion for a new trial based on error in the jury instructions.  *Kolenovic I*, 471 Mass. at 665 & n.2; *Kolenovic II*, 478 Mass. at 192.

However, the trial court granted the motion for a new trial based on ineffective assistance of counsel.  *Kolenovic I*, 471 Mass. at 665.  Kolenovic alleged that his trial counsel provided ineffective assistance by "fail[ing] to fully investigate, present and argue evidence of [his] severe neuropsychiatric disorders."  *Id.* at 669.  On September 2, 2004, the trial court granted his request for an evidentiary hearing as to ineffective assistance of counsel.  *Commonwealth v.*

---

[2] On remand, the case was assigned to Superior Court Justice Mary-Lou Rup, who had also served as the trial-court judge in this case.  As set forth below, the SJC affords "special deference" to the trial court's findings of fact and ultimate decision when the motion judge was also the trial judge.  *See Kolenovic I*, 471 Mass. at 672-73.

*Kolenovic*, 2004 WL 7323128, at *3-4 (Mass. Super. Ct. Sept. 2, 2004).  The evidentiary hearing was bifurcated according to the standard set forth in *Commonwealth v. Saferian*, 366 Mass. 89 (1974), the Massachusetts state analogue of *Strickland v. Washington*, 466 U.S. 668 (1984). (Pet'r's Mem. at 3; Opp'n at 5).

       1.    **Performance**

      The trial court held a hearing on the "performance" prong of the *Saferian-Strickland* analysis on April 26, 2005.  (Evid. Hr'g Tr. at 1, Apr. 26, 2005, ECF No. 2-1 at Ex. 319).  Under that prong, she considered "whether counsel's performance fell 'measurably below that which might be expected from an ordinary fallible lawyer.'"  *Kolenovic I*, 471 Mass. at 669 (citing *Saferian*, 366 Mass. at 96).  Evidence included testimony from trial counsel, Vincent Bongiorni, and the expert retained by trial counsel to assess Kolenovic's intoxication level and history of alcohol dependence, Dr. Fox.  *Kolenovic I*, 471 Mass. at 669; (Pet'r's Mem. at 3-4).

      The trial court found that Bongiorni, who had been retained by Kolenovic's family, was an experienced and successful criminal trial attorney.  *Kolenovic I*, 471 Mass. at 669.  He met with Kolenovic at least ten times in preparation for trial.  *Id.*  While meeting with Kolenovic, he "perceived no evidence of mental illness or impairment," nor did he receive information from Kolenovic or Kolenovic's family that suggested any mental abnormality.  *Id.*  He recognized that Kolenovic had been highly intoxicated at the time of Walker's killing, and he retained Dr. Fox for an opinion as to whether Kolenovic had had the "ability to form the specific intent necessary for first degree murder" considering his alcohol consumption.  *Id.* at 669-70.  Despite the narrow scope of that inquiry, he permitted Dr. Fox to conduct a full psychiatric evaluation of Kolenovic. *Id.* at 670.

      Dr. Fox examined Kolenovic over the course of eight hours, during which Kolenovic discussed many of the hardships he had endured as a child.  *Id.*; (Evid. Hr'g Tr. at 107-112).  Dr.

Fox advised Bongiorni that he was prepared to opine at trial that Kolenovic was incapable of forming the specific intent required for first-degree murder. *Kolenovic I*, 471 Mass. at 670. He offered his opinion in a letter written after meeting with counsel, stating that to "a reasonable degree of medical certainty" Kolenovic "was unable to appreciate the wrongfulness of his act and was unable to conform his conduct to the requirements of law." *Id.* He also informed Bongiorni that he believed Kolenovic had a dual diagnosis of post-traumatic stress disorder ("PTSD") and alcoholism, and he suggested further testing by an expert in PTSD. *Id.*

Bongiorni, however, declined to seek further evaluation of Kolenovic for PTSD. *Id.* Instead, he decided to pursue an intoxication defense only and to limit Dr. Fox's trial testimony to Kolenovic's history of alcohol dependence and intoxication at the time of the murder. *Id.* At the evidentiary hearing, Bongiorni explained his decision, stating that he believed that a dual defense of intoxication and PTSD would have less credibility with the jury and that the PTSD defense could "water down" the evidence that supported an intoxication defense. (Evid. Hr'g Tr. at 53-55). He had not read learned treatises about PTSD, nor did he consider his knowledge of the disorder to be "in-depth," but he had read newspaper articles on the subject, knew generally when PTSD diagnoses had first been accepted, and was familiar with certain criteria for the diagnosis. (*Id.* at 84-85). He was skeptical of Dr. Fox's conclusion and thought the PTSD defense was based on a "shaky factual foundation." (*Id.* at 82). He also feared that the PTSD defense was "overused" and that jurors might perceive it as "an excuse." (*Id.* at 54). The intoxication defense, though, was grounded in a strong "factual basis." (*Id.*). Overall, he believed that there was a "real chance" that the intoxication evidence was "strong enough to win a manslaughter verdict," rather than murder, because the evidence of Kolenovic's history of alcohol use and his consumption on the night of the murder was undisputed. *Kolenovic I*, 471

Mass. at 670.[3]  Bongiorni noted his concern that pursuing a PTSD defense would allow the Commonwealth's experts to examine Kolenovic, which could provide an opportunity to "vitiate the advantage of the overwhelming evidence of the defendant's intoxication." *Id.* at 670-71.

At the evidentiary hearing, Dr. Fox confirmed that he reported his PTSD diagnosis to Bongiorni in advance of trial and advised further evaluation. *Id.* at 671.  Dr. Fox recalled that trial counsel communicated that he intended to pursue only the intoxication defense. *Id.*  Dr. Fox criticized trial counsel's strategic choices, disagreed with the intoxication defense strategy, and expressed frustration that he did not have the opportunity to discuss the issue fully with counsel. *Id.*  In the end, Dr. Fox did testify at trial as to the intoxication defense. *Id.*  The trial court concluded that Dr. Fox told Bongiorni that a PTSD defense might be worth pursuing and that further evaluation and testing would be useful if the defense were presented, but the trial court did not find that Dr. Fox expressed his disagreement as to the trial strategy. *Id.*

On January 19, 2010, the trial court issued a memorandum and order, concluding that Bongiorni's decision not to investigate further the PTSD defense was "manifestly unreasonable." (Mem. & Order on Mot. New Trial at 22, Jan. 19, 2010, ECF No. 2-1 at Ex. 537).  The trial court concluded that Bongiorni had not ignored Dr. Fox's advice, but rather had made a "tactical decision" to not pursue the defense.  (*Id.* at 16).  However, the court also noted that Bongiorni had only a rudimentary understanding of PTSD, that he decided to forgo further investigation of Kolenovic's mental health based on his own assessment, and that he had a "general lack of faith in psychiatry" as a defense in criminal trials.  (*Id.* at 17).  Even though Bongiorni had "provided an excellent defense in many respects," partially succeeding as evidenced by the jury's refusal to

---

[3] The trial judge did note that McCrystal disputed the extent of Kolenovic's intoxication. *Kolenovic I*, 471 Mass. at 671 n.7.  However, McCrystal also had a motive to minimize the intoxication level because of the potential for a civil lawsuit as the owner of the bar where Kolenovic consumed alcohol that night. *Id.*

convict based on deliberate premeditation, the court ultimately determined that a more extensive investigation would have "done nothing to diminish and potentially much to enhance the only possible defense available to defendant." (*Id.* at 21-22).

### 2. Prejudice

After determining that Kolenovic had met his burden on the performance prong of *Saferian*, the trial court held hearings as to the prejudice prong.[4]  On June 10, 2010, Kolenovic presented testimony from Dr. Jonathan Lieff, a neuropsychiatrist with experience in treating violent patients with PTSD.  (Pet'r's Mem. at 4, 17; Opp'n at 6).  On May 22, 2012, the trial court heard testimony from the Commonwealth's rebuttal witness, Dr. David Johnson.  (Pet'r's Mem. at 4; Opp'n at 6).

On November 12, 2013, the trial court issued another memorandum and order, concluding that Kolenovic had presented evidence that he suffered from severe PTSD at the time of the killing.  (Mem. & Order on Mot. New Trial at 6-7, Nov. 12, 2013, ECF No. 2-1 at Ex. 744-45).  Kolenovic met the *Saferian* prejudice prong because trial counsel's decision not to further investigate the PTSD defense likely deprived him "of an otherwise available, substantial ground of defense."  (*Id.* at 11).  Although it noted that Bongiorni's performance was "exemplary" in other respects, his failure to investigate PTSD generated serious doubt that the result of the trial might have been different.  (*Id.* at 8-10).  In the trial court's view, the jury may have convicted Kolenovic of a lesser degree of murder or found a reasonable doubt as to his criminal responsibility if it had been presented with the additional defense.  (*Id.*).  The trial court therefore granted Kolenovic's motion for a new trial based on ineffective assistance of counsel.

---

[4] Because the SJC did not reach the prejudice prong of *Saferian*, the appellate court did not detail the evidence concerning prejudice.  *Kolenovic I*, 471 Mass. at 669 n.6.  As a result, the facts set forth here are taken from briefings and other parts of the record.

(*Id.* at 11).

**D.      Appeal to Massachusetts Supreme Judicial Court**

On November 18, 2013, the Commonwealth filed a notice of appeal from the grant of the new trial motion for ineffective assistance of counsel.  (Opp'n at 6).  On June 23, 2015, the SJC reversed the trial judge's order.  *Kolenovic I*, 471 Mass. at 678.

The SJC summarized the standard of review for grant of a motion for a new trial, which is briefly set forth here.  *Id.* at 672-73.  Under Mass R. Crim P. 30(b), a trial judge may grant a new trial "if it appears that justice may not have been done," and motions should be granted only if the defendant presents a credible reason that outweighs the risk of prejudice to the Commonwealth.  *Id.* at 672 (citing *Commonwealth v. DiCicco*, 470 Mass. 720, 728 (2015)).  On the Commonwealth's appeal of the grant of a defendant's motion for a new trial, the SJC is to consider whether the judge committed a significant error of law or abuse of discretion. *Commonwealth v. Lane*, 462 Mass. 591, 597 (2012).  The trial court abuses discretion when it makes "a clear error of judgment in weighing the factors relevant to the decision . . . such that the decision falls outside the range of reasonable alternatives."  *L.L. v. Commonwealth*, 470 Mass. 169, 185 n.27 (2014) (quotation marks and citation omitted).  Where the motion judge is also the trial judge, the SJC is to give "special deference" to the judge's findings of fact and ultimate decision.  *Lane*, 462 Mass. at 597.

The SJC's opinion also summarized Massachusetts law concerning ineffective assistance of counsel.  *Kolenovic I*, 471 Mass. at 673-74.  Under Massachusetts law, a defendant is denied constitutionally effective assistance of counsel if the representation fell "measurably below that which might be expected from an ordinary fallible lawyer," and that the inadequate performance "likely deprived the defendant of an otherwise available, substantial ground of defense." *Saferian*, 366 Mass. at 96.  Underlying the *Saferian* two-prong test is the right to a fair trial.  *See*

11

*Strickland*, 466 U.S. at 669 ("[T]he purpose of the effective assistance guarantee . . . is simply to ensure that criminal defendants receive a fair trial").  When the claim of ineffective assistance of counsel is based on a strategic decision, the test under Massachusetts law is whether counsel's decision was "'manifestly unreasonable' when made." *Commonwealth v. Acevedo*, 446 Mass. 435, 442 (2006) (quoting *Commonwealth v. Adams*, 374 Mass. 722, 728 (1978)).  Deference is given to tactical and strategic decisions of trial counsel because counsel has the benefit of a full factual picture and "knows best how to defend a client." *Commonwealth v. Florentino*, 396 Mass. 689, 690 (1986).  Such deference also avoids "characterizing as unreasonable a defense that was merely unsuccessful." *Commonwealth v. White*, 409 Mass. 266, 272 (1991).

The SJC analyzed the trial court's order according to the "manifest unreasonableness" standard. *Kolenovic I*, 471 Mass. at 674-78.  It concluded that the record lacked support for the trial court's ruling, even considering the discretion afforded to the judge ruling on the motion. *Id.* at 674.

The SJC first determined that the trial court erred by misapplying the "manifestly unreasonable" test to the facts of the case. *Id.*  It found that Bongiorni's strategic choices "were rational and entirely consistent with what 'lawyers of ordinary training and skill in the criminal law' would deem to be competent." *Id.* at 675 (quoting *Commonwealth v. Pillai*, 445 Mass. 175, 186-187 (2005)).  According to the court, his decision to forgo further investigation of PTSD was an informed strategic and rational choice because he had identified the defense options available and decided that a lack of criminal responsibility or diminished capacity defense was unlikely to succeed. *Kolenovic I*, 471 Mass. at 675.  Citing Massachusetts law, the SJC stated that Bongiorni was not "required to exhaustively explore and identify the constellation of mental diseases later identified in the posttrial examinations." *Id.*

The SJC further concluded that the trial court's "implicit" finding that an attorney of ordinary skills and training would perceive "serious incompetency" in the strategy to forgo an insanity defense in this case was error. *Id.* at 676.  In support of that finding, the SJC relied on the general proposition "counsel and other experienced trial attorneys know all too well," that defending a murder case based on a lack of criminal responsibility is extremely difficult. *Id.* at 675.  The SJC referred to the trial court's comments that the defense would allow examination by the Commonwealth's experts as a "powerful disincentive" to pursue the defense. *Id.*  The court concluded that it was appropriate when choosing defense strategies to give substantial weight to the trial witnesses' agreement that Kolenovic was extremely intoxicated. *Id.* at 675-76. In addition, because Dr. Fox agreed to testify based on only the intoxication defense, Bongiorni would have assumed that this defense was appropriate from a medical point of view. *Id.* at 676. The SJC concluded that there would be no basis to fault him for not pursuing an alternative approach that would have been "likely fraught with difficulty." *Id.*

Overall, the SJC determined that the trial court had not afforded appropriate deference to Bongiorni's strategy choice, especially given the trial court's assessment that his performance was "in all other respects exemplary." *Id.* at 676-77.  The SJC also cautioned against the suggestion that an attorney must submit to the advice of an expert when representing a defendant in a murder case. *Id.* at 677.

The SJC further disagreed with the trial court's application of the case law, concluding that the appellate cases cited did not require a finding that trial counsel's decisions were manifestly unreasonable. *Id.*[5]  The SJC reviewed *Commonwealth v. Walker*, 443 Mass. 213

---

[5] The SJC did acknowledge that the appellate decisions afforded "no clear guidance to the judge." *Kolenovic I*, 471 Mass. at 677.

(2005), which held that it was not manifestly unreasonable for counsel to forgo further investigation when there was minimal evidence of a history of mental-health problems, and *Commonwealth v. Candelario*, 446 Mass. 847 (2006), which held that counsel's decision not to focus on an insanity defense was reasonable because evidence suggested the defendant contrived the mental-health issues that an expert had diagnosed. *Kolenovic I*, 471 Mass. at 677-78. The SJC concluded that the trial judge relied too heavily on posttrial evidence of mental illness to distinguish Kolenovic's case from *Walker* and that reliance on *Candelario* was misplaced because that case was in accord with the view that defense counsel may reject an expert's opinion on a defendant's mental condition "if it's in the best interest of the trial strategy." *Id.* The SJC found that Bongiorni was aware of the implications of a PTSD diagnosis and made a rational decision to rely on a different defense. *Id.* at 678. Thus, he was under no duty to seek further expert opinions and could reject Dr. Fox's opinion if it was in the best interest of trial strategy. *Id.*

Because the SJC concluded that the trial court erred in ruling that Bongiorni's performance was manifestly unreasonable, it did not address the issue of prejudice. *Id.*

### E.   <u>Additional State Proceedings</u>

After the SJC reversed the order for a new trial, Kolenovic sought a remand for the trial court to reconsider its denial of his motion to reduce the verdict pursuant to Mass. R. Crim. P. 25(b). *Kolenovic II*, 471 Mass. at 192. A single justice remanded the matter, and the trial court denied the motion to reconsider. *Id.* Kolenovic appealed that denial to the SJC, which was consolidated with his direct appeal. *Id.* On that appeal, the defendant raised several additional issues, not relevant here. Ultimately, the SJC affirmed the denial of Kolenovic's motion to reduce the verdict and affirmed his conviction. *Id.* at 211.

F.     **Federal Proceedings**

On January 11, 2019, Kolenovic filed this petition for a writ of habeas corpus.  The

petition raises one claim:  that the SJC's ruling in *Kolenovic I* (that trial counsel's decision to

abandon a PTSD investigation and proceed on only an intoxication defense was not ineffective

assistance of counsel) involved an unreasonable application of clearly established federal law.

(Pet'r's Mem. at 1-2).

II.     **Analysis**

A.     **Standard of Review**

If an independent and adequate state-law ground does not preclude review, an application

for a writ of habeas corpus brought by a state prisoner "with respect to any claim that was

adjudicated on the merits in state court proceedings" may be granted only if those proceedings

(1) "resulted in a decision that was contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court of the United States" or (2)

were "based on an unreasonable determination of the facts in light of the evidence presented in

the State court proceeding."  28 U.S.C. § 2254(d).  However, if a claim was not adjudicated on

the merits in State court proceedings, then the claim should be reviewed *de novo* by the federal

district court.  *Cooper v. Bergeron*, 778 F.3d 294, 299 (1st Cir. 2015)*.*

 "Section 2254(d) thus demands an inquiry into whether a prisoner's claim has been

adjudicated on the merits in state court; if it has, [§ 2254(d)]'s highly deferential standards kick

in."  *Davis v. Ayala*, 576 U.S. 257, 269 (2015) (quotation marks omitted).  To decide a federal

claim on the merits, it is not necessary for a state court to explain its reasons in an opinion or to

"cite or even be aware of" Supreme Court case law.  *Harrington v. Richter*, 562 U.S. 86, 98

(2011).  "When a federal claim has been presented to a state court and the state court has denied

relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

of any indication or state-law procedural principles to the contrary." *Id.* at 99.

      **B.**      **<u>Claim of Ineffective Assistance of Counsel</u>**

          **1.**      **<u>Standard</u>**

      Claims of ineffective assistance of counsel under the Sixth Amendment must satisfy the two-part test of *Strickland v. Washington*, 466 U.S. 668 (1984).  To establish ineffective assistance, a petitioner must establish both (1) that his counsel provided deficient assistance and (2) that he suffered prejudice as a result.  *Id.* at 687.

      The first prong of the *Strickland* test requires a petitioner to demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688.  There is a "'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 689); *see also Genius v. Pepe*, 147 F.3d 64, 66 (1st Cir. 1998) ("[C]ounsel's judgments in formulating the defense strategy are entitled to substantial deference.").  A petitioner may overcome the presumption by demonstrating that counsel's alleged errors were so serious that his performance "fell below an objective standard of reasonableness under the circumstances." *Sleeper v. Spencer*, 510 F.3d 32, 38 (1st Cir. 2007) (citing *Strickland*, 466 U.S. at 687-88); *see also Lynch v. Ficco*, 438 F.3d 35, 49 (1st Cir. 2006).

      The second prong of the *Strickland* test requires a petitioner to show that counsel's deficient performance resulted in "prejudice"—that is, that "counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result [was] reliable." 466 U.S. at 687.  Stated differently, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *Sleeper*, 510 F.3d at 39.

      "Surmounting *Strickland*'s high bar is never an easy task." *Harrington*, 562 U.S. at 105

16

(quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)).  "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult" because both standards are "highly deferential."  *Id.* (quoting *Strickland*, 466 U.S. at 689).  "When § 2254(d) applies, the question is not whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard."  *Id.*  A petitioner alleging ineffective assistance under § 2254(d) must not only demonstrate that counsel was ineffective under the *Strickland* standard, but "must also demonstrate that the state court's denial of his claim was objectively unreasonable."  *Abrante v. St. Amand*, 595 F.3d 11, 19 (1st Cir. 2010).

### 2.   **Performance**

The threshold question is whether the state court adjudicated the petitioner's ineffective assistance of counsel claim on the merits.  If so, then the deferential standards of § 2254(d) apply; if not, then this Court reviews the issue *de novo*.  "A matter is 'adjudicated on the merits' if there is a 'decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground.'" *Teti v. Bender*, 507 F.3d 50, 56-57 (1st Cir. 2007) (citing *Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001)).  Here, petitioner's ineffective assistance claim as to trial counsel's failure to investigate Kolenovic's PTSD and associated disorders was considered by the trial court and by the SJC.  As described above, the issue was decided on substantive, not procedural grounds.

The SJC evaluated petitioner's claim under the standard of *Commonwealth v. Saferian*, 366 Mass. 89 (1974), which inquires if counsel's performance fell "measurably below that which might be expected from an ordinary fallible lawyer," and whether such performance "likely deprived the defendant of an otherwise available, substantial ground of defense."  *Saferian*, 366 Mass. at 96.  The *Saferian* standard is the functional equivalent of the federal *Strickland*

standard. *Powell v. Tompkins*, 783 F.3d 332, 349 n.12 (1st Cir. 2015) (citing *Ouber v. Guarino*, 293 F.3d 19, 32 (1st Cir. 2002)).  The SJC analyzed the performance prong of the test for ineffective assistance of counsel, which constitutes a merits adjudication under § 2254(d) on the issue.  *See Gray v. Brady*, 592 F.3d 296, 302 (1st Cir. 2010) (explaining that state-court adjudication is entitled to deference under § 2254(d) so long as the state-law standard is at least as protective of defendant's rights as corresponding federal standard).

To succeed on his claim, petitioner must meet the standards of § 2254(d) by showing that the SJC's decision as to trial counsel's performance "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103; *Rivera v. Thompson*, 879 F.3d 7, 13 (1st Cir. 2018).  The procedural background of this petition is unusual in that the trial court granted the motion for a new trial.  As a result, it presents multiple steps at which deference was overcome.  Under Massachusetts law, courts must give substantial deference to the strategic decisions of defense counsel.  *Glover*, 459 Mass. at 843 (2011).[6]  Here, the trial judge found the evidence sufficient to overcome the deference to trial counsel and grant the motion for a new trial.  Massachusetts law also dictates that the appellate court is to defer to a motion judge's grant of a new-trial order, particularly when the motion judge was also the trial judge.  *Lane*, 462 Mass. at 597.  Here, the SJC found that the trial judge had abused her discretion on the issue and reversed the new trial order.  This Court must analyze the SJC's determination under the "highly deferential standards" of § 2254(d).  *Davis*, 576 U.S. at 269.

Petitioner alleges that the SJC's application of the *Strickland* performance prong

---

[6] Likewise, deference is given to trial counsel's strategic decisions under federal law.  *Harrington*, 562 U.S. at 104 (2011).

constituted an unreasonable application of clearly established Supreme Court precedent because trial counsel's decision not to investigate a defense based on PTSD was not informed and "manifestly unreasonable." (Pet'r's Mem. at 32).  He asserts that trial counsel failed to educate himself and ignored Dr. Fox's advice because the PTSD diagnosis did not fit with counsel's pre-determined plan to present an intoxication defense.  That decision deprived petitioner of a defense that included PTSD, which could have bolstered a diminished-capacity defense under Massachusetts law.  He therefore contends that this omission by trial counsel undermined the fairness of the trial.

To be sure, trial counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  *Strickland*, 466 U.S. at 691.  But when evaluating a decision not to investigate a potential defense, courts assess that decision's reasonableness, "applying a heavy measure of deference to counsel's judgments." *Id.* Here, the SJC afforded trial counsel that deference and reasonably concluded that his tactical decision was "an informed exercise of his prerogative to decide on defense strategy." *Kolenovic I*, 471 Mass. at 675.  Trial counsel testified that he had read articles about PTSD and possessed a general understanding of the origins of the diagnosis, how it had come to be accepted, and "generally what it entailed." (Evid. Hr'g Tr. at 85).  Contrary to the assertion that he was irrevocably tethered to the intoxication defense, he gave Dr. Fox wide latitude when evaluating Kolenovic, allowing for a full psychiatric evaluation. (*Id.* at 100).  That examination allowed Dr. Fox to present his diagnosis of PTSD and discuss with counsel the possibility of a dual defense. (*See id.* at 83-84, 137-42).  Taking all that information together, counsel then made a tactical decision not to further investigate the PTSD defense. (*Id.* at 84).  The fact that he had not read learned treatises on the matter did not render his research inadequate, much less

manifestly unreasonable.

Nor was it unreasonable for trial counsel to disagree with his expert's advice.  As the SJC noted, "[m]edical experts are not attorneys," and "[a] defendant's legal counsel is uniquely qualified to assess the nuances that attend the development of trial strategy."  *Kolenovic I*, 471 Mass. at 677.  In this case, trial counsel was an experienced and capable criminal defense attorney.  A defense predicated on PTSD would have elicited a battle between experts opining on the effects of childhood abuse and whether psychological damage had affected his behavior the night of the murder.  In contrast, trial counsel believed the intoxication defense to be grounded in a "factual basis" that included a breathalyzer test result, witnesses testifying to Kolenovic's drunken state, and an expert estimating Kolenovic's blood alcohol content at the time of the murder.  (Evid. Hr'g Tr. at 54-56).  He reasoned that presenting "two separate theories" would undermine a strong intoxication defense.  (*Id*. at 55).

Petitioner contends that trial counsel's belief that presenting a PTSD defense might have weakened the intoxication defense was unreasonable because both were reinforcing, rather than competing, theories that together strengthened a defense of diminished capacity.  (Pet'r's Mem. at 36-37).  As a logical proposition, that may well be true.  But the reality of trying cases to a jury can be as much art as science, requiring trial counsel to assess how arguments might appeal to both a jury's reason and prejudices.  Trial counsel had doubts about presenting evidence of PTSD because he viewed the defense as "overused" and worried that jurors might perceive it as "an excuse."  (Evid. Hr'g Tr. at 54).  That fear was not unfounded.  At the time, it was not unreasonable to think that psychological defenses would be regarded with suspicion by the public and even members of the legal profession.[7]  Moreover, trial counsel was skeptical of Dr.

---

[7] *See generally*, Alan Dershowitz, THE ABUSE EXCUSE:  AND OTHER COP-OUTS, SOB STORIES, AND EVASIONS OF RESPONSIBILITY, 3 (1994) ("The 'abuse excuse'—the legal tactic by which criminal defendants claim a

Fox's conclusions regarding PTSD because he viewed them as resting on a "shaky factual foundation." (*Id*. at 82). A practical truth about persuading juries is that arguments can detract from one another; a weaker defense may consume additional trial time and juror attention, and create credibility issues, that may undermine a stronger defense. A defendant may be better served by presenting a single defense rather than several. Under the circumstances, the SJC reasonably determined that counsel's tactical decision did not deprive Kolenovic of effective assistance of counsel.

Petitioner cites the Supreme Court's decisions in *Wiggins v. Smith*, 539 U.S. 510 (2003), *Rompilla v. Beard*, 545 U.S. 374 (2005), and *Porter v. McCollum*, 558 U.S. 30 (2009) for the principle that counsel's failure to conduct or complete an investigation violates *Strickland* and entitles petitioner to habeas relief. (Pet. at 28-30). However, the failures to investigate in those cases were egregious and left defendants largely defenseless against prosecution. In *Wiggins*, defense counsel presented a "half-hearted" mitigation defense, invoking the defendant's "difficult life" as a factor lessening his culpability but then failing to uncover the defendant's harrowing history of childhood sexual abuse. 539 U.S. at 526, 517. In *Rompilla*, the prosecution introduced evidence of the defendant's prior rape conviction as an aggravating factor militating for the imposition of the death penalty, yet defense counsel neglected to review the conviction file, thereby "seriously compromising [the defendant's] opportunity to respond to [the] case for

---

history of abuse as an excuse for violent retaliation—is quickly becoming a license to kill and maim."); James Q. Wilson, MORAL JUDGMENT: DOES THE ABUSE EXCUSE THREATEN OUR LEGAL SYSTEM?, 2 (1997) (commenting that evidence-based assessments of defendant behavior had "given way to explaining that behavior on the basis of conflicting theories presented by rival expert witnesses speaking psychobabble."); Craig Burgess, *Proving Post-Traumatic Stress Disorder (with Model Clinical Notes and Testimony)*, 8 Prac. Litig. 9, 10 (1997) ("[O]vercoming the layman's and possibly the court's tendency to regard psychiatric testimony with undue suspicion is crucial to the attorney and to the forensic expert."); Stephanie B. Goldberg, *Fault Lines*, 80 A.B.A. J. 40, 40 (1994) (describing contemporary public perception of courts being "awash" with defendants claiming an "alphabet soup of syndromes," including post-traumatic stress disorder).

aggravation." 545 U.S. at 385.  And in *Porter*, defense counsel, who had never represented a

client in a death penalty sentencing, failed to "even take the first step" of interviewing witnesses

or requesting records that would have uncovered the defendant's history of childhood abuse and

heroic military service, the trauma of which left him with serious substance abuse and mental

health problems.  558 U.S. at 39, 33.  That failure left the defendant without any defense except

"inconsistent testimony about Porter's behavior when intoxicated and testimony that [he] had a

good relationship with his son." *Id.* at 32.  In each of these cases, the failure to investigate the

basic, factual background of a defendant's life rendered counsel's assistance constitutionally

defective. [8]

In addition to those decisions, *Cullen v. Pinholster*, 563 U.S. 170 (2011), is instructive.

In that case, defendant's counsel chose not to prepare a mitigation defense, instead seeking to

exploit a legal technicality. *Id.* at 191-92.  Counsel's gambit entailed declining an invitation

from the prosecution to review the defendant's prison file and later seek to exclude any

aggravation evidence by claiming that the prosecution had failed to provide notice of the

evidence to be introduced, as required by state law. *Id.* at 176, 191-92.  When the prosecution

presented aggravation evidence, counsel explained that because of the lack of notice, he was

unprepared to offer any mitigation evidence in opposition. *Id.* at 176.  He then refused the

court's offer of a continuance, saying that the extra time would not "make a great deal of

difference." *Id.* at 176.  Ultimately, the only witness the defense presented in mitigation was

defendant's mother, who testified to his troubled upbringing. *Id.* at 177.  Counsel pursued that

---

[8] A similar set of issues was present in *Dugas v. Coplan*, 428 F.3d 317 (1st Cir. 2005).  In *Dugas*, the state brought arson charges against the defendant for allegedly setting fire to his own grocery store.  The state's case relied heavily on expert testimony that the fire was indeed an arson.  In response, defendant's counsel neglected to even consult an arson expert, despite raising a "no arson" defense at trial. *See id.* 323-24, 328.  Thus, the defendant was left effectively defenseless. *See id.* 329-332.

stratagem despite acknowledging that the prosecution might have satisfied the notice requirement.  *Id.* at 192.  Nevertheless, the Supreme Court held that, given the circumstances of the case, the strategy employed may have been sound and the state court was reasonable in concluding that defendant had failed to "rebut the presumption of competence mandated by *Strickland*."  *Id.* at 191-92, 194.

Here, trial counsel's performance falls well within the range of constitutionally adequate representation.  He investigated Kolenovic's life by procuring medical records, interviewing family members, and seeking an expert opinion.  He was aware of Kolenovic's extensive history of alcoholism, which stretched back to early childhood.  He knew that Kolenovic's father had been physically abusive.  He hired an expert to assess Kolenovic's level of intoxication at the time of the murder and allowed that expert to perform a complete psychiatric evaluation over the course of eight hours of interviews, which uncovered the childhood trauma that contributed to Kolenovic's PTSD.[9]  Those investigations canvassed the events of petitioner's life and provided trial counsel with an informed basis from which to make a tactical decision regarding the best defense to raise at trial.  He chose an intoxication defense and executed that defense by presenting to the jury empirical evidence, as well as witness and expert testimony.

In essence, petitioner contends that trial counsel chose the wrong defense strategy.  That is not a proper basis for habeas relief because "[e]ven the best criminal defense attorneys would not defend a particular client in the same way."  *Strickland*, 466 U.S. at 689.  Defense lawyers

---

[9] Trial counsel was uncertain whether he and Dr. Fox had discussed the childhood traumas unearthed during Kolenovic's sessions with Dr. Fox—specifically, the witnessing, at age two, of the death of a brother who was struck by a car and the setting of a fire, at age five, for which he let his developmentally disabled sister be blamed, resulting in a lifetime of guilt.  (Evid. Hr'g Tr. 66-68, 107-09).  However, Dr. Fox testified that he did inform trial counsel about those events.  (*Id.* 162-63).  In any event, trial counsel did his due diligence by engaging an expert who supplemented and confirmed aspects of a biographical history of the defendant's life that trial counsel obtained from multiple sources.

have "limited time and resources, and so must choose from among countless strategic options." *Dunn v. Reeves*, 141 S. Ct. 2405, 2410 (2021) (per curiam) (quotation marks omitted).  Courts reviewing for ineffective assistance of counsel must thus determine whether "no competent lawyer" would have made the same decision under the circumstances.  *See Lynch*, 438 F.3d at 49.  When a state court determines that trial counsel's assistance passed constitutional muster, federal courts are required by § 2254(d) to uphold that determination unless it reflects an "extreme malfunction[] in the state criminal justice system[]."  *Harrington*, 562 U.S. at 102.

No such defect was present here.  Petitioner may, in hindsight, believe that he would have benefitted from a different defensive strategy, but the defense presented by trial counsel ensured the integrity of the "adversarial testing process."  *Strickland*, 466 U.S. at 690.  The SJC was reasonable in not determining otherwise.[10]

**Conclusion**

For the foregoing reasons, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(d) is DENIED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated: November 9, 2021                                      Chief Judge, United States District Court

---

[10] Because petitioner has not demonstrated that the SJC's determination concerning the performance prong of *Strickland* was objectively unreasonable, an analysis of the prejudice prong is not required at this time.